UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X

RUDOLPH MILLS,

                         Plaintiff,

  -against-

STEUBEN FOODS, INCORPORATED, ERIC
PETERSON, individually, ANDREA SCANZUSO,
individually, KENNETH STANLEY, individually,
JOSEPH RENALDO, individually, JOHN CAVAR,
individually, and DEBRA GORSKI, individually,

                       Defendants.

---------------------------------------------------------------------X

**Case No:  19-cv-1178**

**COMPLAINT**

Plaintiff Demands a
Trial by Jury

Plaintiff, RUDOLPH MILLS (hereinafter referred to as "Plaintiff"), by and through his
attorneys, DEREK SMITH LAW GROUP PLLC, hereby complains of Defendant STEUBEN
FOODS, INCORPORATED. (hereinafter referred to as "STEUBEN"), ERIC PETERSON
(hereinafter referred to as "PETERSON"), ANDREA SCANZUSO (hereinafter referred to as
"SCANZUSO"), KENNETH STANLEY (hereinafter referred to as "STANLEY"), JOSEPH
RENALDO (hereinafter referred to as "RENALDO"), JOHN CAVAR (hereinafter referred to as
"CAVAR") and DEBRA GORSKI (hereinafter referred to as "GORSKI"), upon information and
belief, as follows:

**<u>NATURE OF CASE</u>**

Plaintiff, RUDOLPH MILLS, complains pursuant to Title VII of the Civil Rights Act of
1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (amended in 1972, 1978 and by the Civil Rights
Act of 1991, Pub. L. No. 102-166 ("Title VII"), 42 U.S.C. §1981 ("Section 1981"), and the laws
of the State of New York, based upon the supplemental jurisdiction of this Court pursuant to *United
Mine Workers of America v. Gibbs*, 383 U.S. 715 (1966), and 28 U.S.C. §1367 seeking declaratory

relief and damages to redress the injuries Plaintiff has suffered as a result of, *inter alia*, race discrimination, hostile work environment and retaliation by Defendants.

## PRELIMINARY STATEMENT

This case involves numerous blatant and abhorrent instances of racial discrimination in the workplace as well as an appalling absence of accountability and inexcusable, officially sanctioned bullying and retaliation at Defendant, Steuben Foods, Inc., after the Plaintiff, Rudolph Mills, a loyal eleven-plus year employee at Steuben, made numerous complaints about shocking and wildly inappropriate racial slurs used against him by supervisors and managers.   After Plaintiff complained about supervisors and managers routinely and openly referring to him as a "**NIGGER**", a "**COON**" and a "**MONKEY**," Defendants' Human Resources managers and supervisory personnel, as a matter of course, told Plaintiff to "**LEAVE IT ALONE**" and he was threatened with termination and eventually terminated for continuing to complain.   Equally outrageous is the fact that Steuben committed egregious and dangerous safety violations thereby threatening the health, safety and lives of innumerable unwitting American and Canadian consumers.   The health and safety violations Plaintiff complained of and refused to participate in include, *inter alia*: the contamination of food products with cleaning acid; at least one metal object falling into and being sealed inside a container with food products; the running of at least one production line without proper sterilization; improperly packaging and labeling meats; and knowingly allowing production lines to be supervised by an employee who was visibly intoxicated on illegal narcotics, likely powerful opioids. Instead of complying with their moral and legal obligations to address and correct the shockingly commonplace racial discrimination and the equally commonplace and frightening safety violations present in their facility, Defendant Steuben

Foods elected to take the most irresponsible, despicable and illegal step of terminating Plaintiff's employment because of his complaints and objections.

## JURISDICTION AND VENUE

1.    Jurisdiction of this action is conferred upon this Court as this case involves a Federal Question under Title VII and 42 U.S.C. §1981.  The Court also has jurisdiction pursuant to 29 U.S.C. §2617; 28 U.S.C. §1331, §1343 and pendent jurisdiction thereto.

2.    Additionally, the Court has supplemental jurisdiction under the State laws of New York.

3.    Around February 8, 2018, Plaintiff RUDOLPH MILLS submitted a Charge of Discrimination to the U.S. Equal Employment Opportunity Commission ("EEOC").   The federal charge number is 525-2017-00832.

4.    Around June 6, 2019 Plaintiff received a Right to Sue Letter from the EEOC for federal charge number 525-2017-00832.

5.    Plaintiff satisfied all administrative prerequisites and is timely filing this case within ninety (90) days of receiving his Right to Sue letter.

6.    Venue is proper in this court, as the events giving rise to this action arose in Erie County within the Western District of New York.

## PARTIES

7.     Plaintiff RUDOLPH MILLS (hereinafter referred to as "Plaintiff" and/or "MILLS") is seeking damages to redress the injuries Plaintiff has suffered as a result of being discriminated against by his employer on the basis of his race, together with a hostile work environment, retaliation and wrongful termination. Further, Defendants retaliated against and wrongfully terminated Plaintiff for complaining to Defendant, objecting to and refusing to participate in practices that

violated New York state and Federal food safety statutes and regulations, which created and presented a substantial and specific harm to public health and safety.

8.     Plaintiff MILLS is an individual African American male, who is a resident of the State of New York, County of Richmond.

9.     Defendant STEUBEN is a domestic business corporation of the State of New York duly existing by the virtue and laws of the State of New York that does business in the State of New York.

10.     Defendant STEUBEN operates a high-volume food processing and packaging plant in Elma, New York (hereinafter referred to as the "Elma Plant") that processes and packages a wide variety of food products for distribution and sale in the consumer marketplace in the United States and Canada.

11.     Defendant STEUBEN's Elma Plant's production capabilities and products include, but are not limited to the following: Organic Dairy and Plant-based Milks, Almond Milk, Coffee Creamers, Drinkable Yogurt, Flavored Milk, Horchata, Non-Alcoholic Drink Mixers, Shakes, Soymilk, Sweetened Condensed Milk, Cereal Beverages, Custard Bases, Energy Drinks, Gravy, Ice Cream Mix, ready to drink Coffee/Tea, Smoothies, Sport Protein Beverages, Weight Control Drinks, Coconut Milk, Dairy/Soy Frappe Beverages, Evaporated Milk, High-Protein Drinks, Meal Replacement Drinks, Sauces, Soups, and Stocks/Broth. Defendant STEUBEN co-manufactures products for a variety of customers, including some of the largest food companies in the world and with brands available in major grocery retail chain stores in the United States and Canada.

12.     Name-brand products processed and packaged at Defendant STEUBEN's Elma Plant include and have included widely distributed household brand name food and drink products such as:

Nestle, Horizon Organic Milk, Hormel, Vitasoy, at least one major "fresh format" retail grocery store brand, several major "big box" store brands, Starbucks, Cold Stone Creamery, Earth's Own, Pharmalab Over The Counter Dietary Supplements, Elmhurst Dairy, Elmhurst Naturals, Elmhurst Milked and numerous others[1].

13.  At all times material, Defendant ERIC PETERSON (hereinafter referred to as "PETERSON") was and is a supervisor for Defendant STEUBEN, and held supervisory authority over Plaintiff with regard to his employment.

14.  At all times material, Defendant ANDREA SCANZUSO (hereinafter referred to as "SCANZUSO") was and is a Human Resources manager for Defendant STEUBEN, and held supervisory authority over Plaintiff with regard to his employment.

15.  At all times material, Defendant KENNETH STANLEY (hereinafter referred to as "STANLEY") was and is a manager for Defendant STEUBEN, and held supervisory authority over Plaintiff with regard to his employment.

16.  At all times material, Defendant JOSEPH RENALDO (hereinafter referred to as "RENALDO") was and is a lead supervisor for Defendant STEUBEN, and held supervisory authority over Plaintiff with regard to his employment.

17.  At all times material, Defendant JOHN CAVAR (hereinafter referred to as "CAVAR") was and is a manager for Defendant STEUBEN, and held supervisory authority over Plaintiff with regard to his employment.

18.  At all times material, Defendant DEBRA GORSKI (hereinafter referred to as "GORSKI"), was and is a manager for Defendant STEUBEN, and held supervisory authority over Plaintiff with regard to his employment.

---

[1] All of the products, brands and company names listed herein and information pertaining to their association with Defendant STEUBEN are readily available to the public via internet search engines such as Google.

19.   At all times material, GEORGE PETERSON, was a supervisor/manager for Defendant STEUBEN, and held supervisory authority over Plaintiff with regard to his employment.

## MATERIAL FACTS

20.   Plaintiff, began his employment with Defendant STEUBEN at the Elma Plant, as a Filler Operator around May of 2010.

21.   Around September/October of 2014, Plaintiff noticed leaking cartons of milk on the conveyor belt and responded by immediately stopping the conveyor in order to retrieve the leaking cartons and notified the operator at the time, Defendant GORSKI. In response, GORSKI yelled at Plaintiff "**WHY IS MY** [Gorksi's] **LINE DOWN? ALWAYS A NIGGER!"**

22.   Plaintiff immediately complained to his supervisors and managers regarding Defendant GORSKI's use of the highly offensive racist slur in the workplace.

23.   In response to Plaintiff's complaint, Defendants CAVAR and SCANZUSO both threatened Plaintiff that he should "**LEAVE IT ALONE**" or Plaintiff would be suspended or terminated.

24.   Plaintiff further complained that Defendants should take some kind of disciplinary action against GORSKI for calling Plaintiff a "**NIGGER**".

25.   After Plaintiff went home following the end of his shift, he received a phone call from Supervisor CAVAR telling Plaintiff not to return to work until he was contacted by Human Resources. The following day, Plaintiff received a phone call from Human Resources informing him that he was suspended for three (3) days.

26.   Defendant SCANZUSO informed Plaintiff that he was suspended because he complained about Defendant GORSKI's use of the racist slur.

27.   Around April of 2015, Plaintiff was having a discussion with Defendant PETERSON, during

which Plaintiff mentioned that he would have more seniority if there had not been such a delay in hiring him from a temp to a permanent employee. In response Peterson stated, "**WE ONLY HIRED YOU** [Plaintiff] **BECAUSE WE THOUGHT YOU WERE INDIAN NOT A NIGGER.**" Defendant PETERSON started laughing after making this statement.

28.   Defendant CAVAR, who was present and witnessed Defendant PETERSON's outrageously inappropriate racist statement, immediately told Plaintiff, "**RUDY, HE** [Peterson] **WAS JOKING. LEAVE THAT ALONE."** Plaintiff requested that Defendant CAVAR accompany Plaintiff to Human Resources to address Defendant PETERSON's, inflammatory and racially charged comments.

29.   Plaintiff brought his complaint regarding the incident to Defendant STANLEY, and Department Manager Karen M. Schoenhals (hereinafter referred to as "Schoenhals").

30.   Around one-week later, Plaintiff approached Schoenhals and Defendant STANLEY, to follow up about his complaint regarding Defendant PETERSON. In response Schoenhals told Plaintiff, "**YOU KNOW ERIC [Defendant PETERSON] HAS A DRUG PROBLEM**" and had recently been written up for other issues. Plaintiff then asked if Defendant CAVAR, was interviewed as a witness of the incident and when he did not receive a response, he asked Defendant STANLEY, "**IS THIS ANOTHER BRUSH UNDER THE RUG DEAL**?" STANLEY promised Plaintiff he would he would investigate the situation but failed to ever follow up with him regarding his complaint.

31.   No disciplinary action was taken against Defendant PETERSON for the racist statement he made toward Plaintiff.

32.   After Defendants failed to appropriately reprimand Defendant PETERSON for his racist outburst, PETERSON began to repeat the racist statement as a running joke.

33.   Throughout Plaintiff's employment with Defendants, starting in around April of 2015 through around August of 2017, Defendant PETERSON routinely stated to Plaintiff: "**WE ONLY HIRED YOU BECAUSE WE THOUGHT YOU WERE INDIAN. WE NEVER WOULD HAVE HIRED YOU IF WE KNEW YOU WERE A NIGGER,**" or words to that effect, and then Defendant PETERSON would laugh.

34.   Plaintiff routinely complained to company supervisors and bosses regarding Defendant PETERSON's racist insults and taunts.  However, no substantive remedial action was ever taken by Defendants to substantively address or remedy these complaints.

35.   In response to Plaintiff's complaints about racism in the workplace, Defendants routinely threatened Plaintiff with disciplinary action and termination for making complaints about racism.

36.   Beginning around May 2015, Plaintiff made several verbal inquiries with his supervisors Defendant CAVAR and GEORGE PETERSON[2], about a potential promotion to a Grade II filler operator. Despite having been assigned to train several of his peers and new hires Plaintiff's pay and status as a Grade I filler operator remained the same. Defendants told Plaintiff that, "**THE ONLY WAY YOU** [Plaintiff] **WOULD BECOME A GRADE II OPERATOR IS IF YOU** [Plaintiff] **LEAVE THE SHIFT."** Plaintiff was not promoted to a Grade II operator until approximately two years later after numerous complaints about the Defendants' refusal to promote him.

37.   During this period, numerous less experienced, less qualified and less tenured non-African American employees were promoted to Grade II operators ahead of Plaintiff.

38.   During this period, numerous less experienced, less qualified and less tenured employees who

---

[2] George Peterson, who was a Caucasian male, would have been named as an individual defendant in this action if not for the fact that he is now deceased.

never complained of race discrimination were promoted to Grade II operators ahead of Plaintiff.

39. Defendants refused to promote Plaintiff and promoted other less qualified employees before Plaintiff because of Plaintiff's race and because Plaintiff complained about racist comments made by supervisors.

40. On or about April 2016, Defendant PETERSON, approached Plaintiff in an attempt to solicit prescription painkiller medication from him upon his return to work from medical leave for a surgical operation. PETERSON specifically asked about the drug Oxycodone and offered both cash and overtime hours in exchange for the drug. After being denied by Plaintiff, Defendant PETERSON became irate and exclaimed "**WHO DOES THIS NIGGER THINK HE IS?**"

41. Plaintiff immediately sought out Defendant's President of Human Resources, Julie Senko, to make a complaint. After being told that she was not available, Plaintiff met with and complained to Defendant's Human Resource Manager, Defendant SCANZUSO, regarding PETERSON's behavior. Plaintiff never received a response from Defendants regarding this complaint.

42. Around August of 2016, Defendants' supervisor/manager, GEORGE PETERSON, verbally assaulted Plaintiff and accused Plaintiff of paging the maintenance supervisor to Plaintiff's work area without the permission of a supervisor. GEORGE PETERSON said, "**THIS MONKEY DOESN'T UNDERSTAND THE CHAIN OF COMMAND.**"

43. GEORGE PETERSON, immediately directed Plaintiff to punch out and go home prior to the end of his shift. Plaintiff complained to Human Resources regarding Defendant GEROGE PETERSON's behavior and racist comment.

44. Mr. Peterson was never disciplined for calling Plaintiff a "**MONKEY**".

45.  Around January 29, 2017, while cleaning a filler machine, Plaintiff noticed that a hose containing cleaning acid was connected to another filler machine that was operating with live product resulting in the acid chemical being pumped into the milk product that was being processed for packaging and shipping. Plaintiff immediately notified his supervisor, Defendant RENALDO, who confirmed that the hose carrying the acid chemical was connected to the filler processing milk product.

46.  Milk contaminated with cleaning acid constitutes an imminent threat to public health and safety because the products processed through the line were to be immediately distributed in the public consumer marketplace for human consumption.

47.  Defendant RENALDO notified a lab technician who tested the milk product and confirmed that he detected high amounts of the acid chemical in the milk. RENALDO then shut down the line, putting production on hold and told Plaintiff not to mention the contaminated milk to anyone. While on his break Plaintiff objected to this violation of health and safety precautions and informed Department Manager, Schoenhals, about the situation.

48.  After Schoenhals addressed the situation with Defendant RENALDO, REYNALDO became irate and told Plaintiff, "**DIDN'T I [**Renaldo**] TELL YOU** [Plaintiff] **NOT TO MENTION THIS TO ANYONE UNTIL I INVESTIGATED IT AND PUT THINGS ON HOLD?"** Plaintiff responded by informing Defendant RENALDO, that Plaintiff felt obligated to inform Department Manager, Schoenhals, due to the imminent threat that the contaminated milk presents to public health and safety.

49.  Around February of 2017, Plaintiff was operating a filler machine processing chicken and seafood to be packaged and sealed for shipping. During the course of production Plaintiff noticed that the chicken was being placed in the wrong packaging. Generally all seafood goes

in blue cartons while the chicken is packaged in brown cartons. In this instance, the chicken was being placed in to blue cartons.

50. Such improper packaging created a specific and imminent threat to public health and safety because the improperly packaged food was destined to be immediately shipped for consumption by the public.

51. Studies have shown that the prevalence of chicken allergies can be as high as 5% and that consumption of chicken by allergic persons can cause anaphylaxis, which if not immediately treated is often deadly.

52. Plaintiff immediately notified Defendants via his supervisors for the shift. Upon investigating further, Defendants' supervisor shut down the processing line and had to retrieve the previously packaged and improperly labeled food from the warehouse.

53. Around June/July of 2017, Defendant GORSKI, wrote the words "**FUCKING NIGGER**" with what appeared to be lipstick on the side of Plaintiff's car in the parking lot.

54. Plaintiff immediately complained to Human Resources about the racist graffiti on his car and was accompanied by President Senko and Defendant SCANZUSO, to Plaintiff's car in the employee parking lot where pictures were taken of the racist graffiti and Plaintiff was promised that "**THIS WILL BE DEALT WITH.**" The aforementioned occurrence was also witnessed by several of Defendants' employees.

55. Despite this undeniable and egregious act of racism, no corrective or disciplinary action was taken against Defendant GORSKI in response the incident of blatant racism.

56. Around July/August of 2017, Plaintiff was approached by Defendant PETERSON, who inquired whether Plaintiff was interested in staying after his shift to work overtime. Plaintiff had previously informed PETERSON that he would not be able to work overtime due to

previous commitments and childcare obligations. Plaintiff complained to Defendant CAVAR, who then asked Defendant PETERSON, "**HOW LONG DO YOU NEED HIM FOR?"** PETERSON replied, **"MAYBE A HOUR."**

57.   Following his meeting with Defendant PETERSON, PETERSON asked Plaintiff if he had any opiate pills and told Plaintiff that another employee informed Defendant PETERSON that they saw Plaintiff place a bottle of medication (prescribed to Plaintiff by his physician) in Plaintiff's locker. Approximately half an hour later Plaintiff was paged by Defendant PETERSON over the PA system informing Plaintiff that he could go home for the day.

58.   Plaintiff immediately went to the locker room to collect his belongings before heading home for the day. Upon approaching his locker, Plaintiff noticed that his lock had been removed from his locker.  Upon further inspection Plaintiff discovered that his medication was missing from his locker. Plaintiff then complained to Defendants' Human Resources personnel, who then paged the Maintenance Supervisor on duty to inquire who authorized them to remove the lock. The maintenance supervisor on duty replied that Defendant PETERSON, told the maintenance supervisor to remove Plaintiff's lock because Plaintiff purportedly told PETERSON that "I [Plaintiff] FORGOT MY COMBINATION." Plaintiff never requested that Defendant PERTERSON have his lock removed from his locker.

59.   Plaintiff informed Human Resources that Defendant PETERSON caused Plaintiff's locker to be opened without Plaintiff's knowledge and stole Plaintiff's oxycodone paid medication that Plaintiff had been prescribed following surgery.

60.   Defendants' Human Resources Department failed to address the matter of PETERSON removing Plaintiff's lock and stealing Plaintiff's medication from his locker.

61.   On numerous occasions Plaintiff and several coworkers as well as surveillance cameras

observed Defendant PETERSON appear to 'nod-off' in an apparent narcotic-induced stupor while Defendant PETERSON was supervising active production lines.

62. Upon information and belief, Defendant PETERSON supervised active production lines at Defendant STEUBEN while under the influence of illegally obtained narcotics.

63. Upon information and belief, Defendant STEUBEN was fully aware of Defendant PETERSON's use of illicit narcotics in the workplace.

64. On or about August 15, 2017, while operating a filler machine, Plaintiff notice that a piece of metal, which was responsible for the top fold indentation in each milk carton in preparation for filling and sealing was missing. Plaintiff suspected that the missing piece had fallen into one of the cartons so he immediately paged and notified Defendants CAVAR and RENALDO.

65. Plaintiff searched for the missing piece along with Defendants CAVAR and RENALDO, in the floor to no avail. Plaintiff informed Defendants that he believed the piece had fallen into one of the packaged and finished cartons that had already been shipped to the warehouse.

66. After searching through hundreds of milk containers the missing metal piece was finally located.

67. Around August of 2017, Plaintiff noticed that there was a peroxide leak in the side of the filler machine that he was operating at the time.

68. Peroxide is used for sanitation and sterilization purposes on the production line.

69. Such a leak constitutes an imminent threat to public health and safety because the equipment and products processed through the line were not properly sanitized and were to be immediately distributed in the public consumer marketplace for human consumption.

70. Plaintiff immediately paged Defendant PETERSON, who was the acting shift supervisor at the time, to address the issue because according to the applicable safety statutes and regulations,

there should never be any leaks.

71.   Defendant PETERSON ordered Plaintiff to run the filler as it was despite the peroxide leak. Plaintiff objected and refused to restart the line until the leak was fixed and requested to obtain additional authorization from Department Manager Schoenhals or someone of high authority to run the filler in the unauthorized position due to the imminent threat to public health and safety posed by disregarding the legally mandated and standard operating procedure for filler machines.

72.   Defendant PETERSON began shouting and was visibly irate and upon discovering the Plaintiff had not restarted the filler machine and Defendant PETERSON yelled "**TELL THAT FUCKING COON TO START UP THAT FILLER RIGHT NOW OR I'M SENDING HIM HOME.**"

73.   Plaintiff reported this incident to Human Resources and made a report of the racially derogatory slur Defendant PETERSON shouted about him.

74.   The following day Plaintiff was called in to Human Resources to explain the leak and his subsequent interactions with Defendant PETERSON. Plaintiff was later informed by a coworker that the coworker reported the incident to Human Resources and requested to remain anonymous out of a fear of potential retaliation by Defendant PETERSON. Plaintiff was informed by the coworker that he had provided Human Resources with a detailed written statement regarding the incident at their request.

75.   Around August 30, 2017, Defendants terminated Plaintiff's employment because of his race and in retaliation for and because of the numerous complaints and objections Plaintiff made regarding racial discrimination, racist comments and as well as Plaintiff's complaints about production line problems that presented imminent threats to public health and safety.

76.    Following his termination, Plaintiff submitted an application to obtain Unemployment Benefits from the New York State Department of Labor. Defendants attempted to deny Plaintiff's application in further retaliation for his complaints about Defendants' unlawful and discriminatory behavior by falsely claiming that Plaintiff was terminated for cause.

77.    In a hearing on Plaintiff's claim for unemployment benefits, the presiding Administrative Law Judge Jennifer Snyder-Haas held that, as no evidence was presented showing that Plaintiff engaged in any type of misconduct warranting termination and that Plaintiff was therefore not subject to disqualification for unemployment benefits on the basis of a loss of employment through misconduct in connection with his employer Defendant STEUBEN.

78.    Upon information and belief, the safety violations Plaintiff complained of, objected to and refused to participate in constitute violations of state and federal statutes and regulations including (but not limited to): the New York Consolidated Laws, Agriculture and Markets Law, Articles 4, 17 and 21; Title 21 of the CFR §§ 110.35, 110.37, 110.40 and 178.1010; and United State Department of Agriculture's General Specifications for Dairy Plants Approved for USDA Inspection and Grading Service §§ 58.151, 58.229 and 58.241.

79.    Around February 8, 2018, Plaintiff filed a charge of employment discrimination with the EEOC *pro se*, which was assigned Federal Charge Number 525-2017-00832.

80.    Plaintiff suffered anxiety, high blood pressure and was eventually hospitalized on multiple occasions due to the stress from the constant racist bullying and retaliation Defendants inflicted upon him.  Plaintiff received mental health treatment and eventually required medication due to the retaliation he faced in response to his complaints about racism and objections to unsafe and unlawful safety practices regarding food products destined for the marketplace and intended for human consumption.

81. Defendant STEUBEN was well aware of the ongoing discrimination, retaliation and bullying against Plaintiff via his numerous complaints to STEUBEN supervisors and management including Human Resources Manager, Defendant SCANZUSO, but no corrective action was taken.

82. On numerous occasions throughout his employment with Defendant STEUBEN, including in the two months immediately preceding Plaintiff's termination, Defendant SCANZUSO routinely threatened Plaintiff with termination in response to Plaintiff's complaints about racism and racist comments in the workplace.

83. Defendant STEUBEN terminated Plaintiff's employment because of Plaintiff's race and because of the numerous complaints and objections to STEUBEN supervisors and management Plaintiff made regarding ongoing and egregious race discrimination including racist comments by supervisors and racist graffiti on Plaintiff's car.

84. Defendant STEUBEN was well aware of the numerous complaints and objections to STEUBEN supervisors and management Plaintiff had made regarding safety and processing issues that created and presented imminent threats to public health and safety.

85. Defendant STEUBEN terminated Plaintiff's employment because of the numerous complaints and objections to STEUBEN supervisors and management Plaintiff had made regarding safety and processing issues that created and presented imminent threats to public health and safety.

86. As a result of Defendants' unlawful action, Plaintiff felt extremely humiliated, degraded, victimized, embarrassed and emotionally distressed.

87. As a result of Defendants' unlawful and discriminatory actions, Plaintiff has endured unwarranted professional humiliation resulting in extreme emotional distress, severe depression, and extreme anxiety. Further, Plaintiff claims aggravation, activation and/or

exacerbation of any preexisting condition.

88.   As a result of Defendants' unlawful and discriminatory actions, Plaintiff has endured unwarranted financial hardships and irreparable damage to his professional reputation.

89.   As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, the loss of a salary, bonuses, benefits and other compensation, which such employment entails. Plaintiff has also suffered pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

90.   As Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, Plaintiff demands punitive damages against Defendants.

91.   The above are just some examples of the unlawful discrimination to which Defendants subjected Plaintiff.

92.   Plaintiff claims a continuing practice of discrimination and claims a continuing violation and makes all claims herein under the continuing violations doctrine. The Defendants' acts and/failures to act constituted a continuing violation of federal, state and city law.

93.   Plaintiff hereby demands reinstatement.

94.   Defendants discriminated against Plaintiff because of his race and color and because he complained about and opposed the unlawful conduct of Defendants related to the above protected classes.

95.   Defendant STEUBEN, terminated Plaintiff because Plaintiff objected to and refused to participate in Defendants' violation of Federal and New York state food safety statutes and regulations.

96.   Plaintiff claims alternatively (in the event Defendants claims so or that the Court so

17

determines) that Plaintiff was an independent contractor, and Plaintiffs makes all applicable claims for the above conduct and facts under the applicable law pertaining to independent contractors.


## AS A FIRST CAUSE OF ACTION
## FOR DISCRIMINATION UNDER TITLE VII
## (Not Against Individual Defendants)

97.     Plaintiff repeats and re-alleges each and every allegation made in the above paragraphs of this complaint as if fully set forth at length.

98.     Title VII states in relevant part as follows: SEC. 2000e-2. [Section 703] (a) Employer practices, It shall be an unlawful employment practice for an employer - (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin;

99.     Defendant STEUBEN engaged in unlawful employment practices prohibited by 42 U.S.C. §2000e et seq., as set forth herein.


## AS A SECOND CAUSE OF ACTION
## FOR RETALIATION UNDER TITLE VII
## (Not Against Individual Defendants)

100.    Plaintiff repeats and re-alleges each and every allegation made in the above paragraphs of this complaint as if fully set forth at length.

101.    Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-3(a)  provides  that

it shall be unlawful employment practice for an employer:

"(1) to . . . discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

102.     Defendant STEUBEN engaged in unlawful employment practice prohibited by 42 U.S.C. §2000e et seq. by retaliating against Plaintiff with respect to the terms, conditions or privileges of employment because of Plaintiff's opposition to the unlawful employment practices of Defendants.

## AS A THIRD CAUSE OF ACTION
## DISCRIMINATION AND RETALIATION IN VIOLATION
## OF 42 U.S.C. § 1981
## (Against All Defendants)

103.     Plaintiff repeats and re-alleges each and every allegation made in the above paragraphs of this complaint as if fully set forth at length.

104.     42 U.S.C. §1981 states as follows, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

105.     Section 1981 further states that, "For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

106.   Defendants discrimination against Plaintiff in violation of the rights of Plaintiff as afforded to
       him by the Civil Right Act of 1866, 42 U.S.C. §1981.

107.   By the conduct described above, Defendants intentionally deprived Plaintiff, of the same rights
       as are enjoyed by both other Caucasian and non-Black citizens, to the creation, performance,
       enjoyment and all benefits and privileges of their employment relationship with Defendants.

108.   As a result of Defendants' discrimination in violation of Section 1981, Plaintiff has been denied
       employment opportunities providing substantial compensation and benefits, thereby entitling
       them to injunctive and equitable monetary relief, and has suffered anguish, humiliation,
       distress, inconvenience and loss of enjoyment of life because of Defendants' actions, thereby
       entitling them to compensatory damages.

109.   Defendants violated 42 U.S.C. §1981 by both discriminating against Plaintiff because he is
       African American and because he opposed the above described discriminatory behavior.

110.   Defendants acted with malice or reckless indifference to the rights of Plaintiff, thereby entitling
       him to an award of punitive damages.

111.   To remedy the violations of the rights of each individual Plaintiff secured by Section 1981,
       Plaintiff requests that the Court award the relief prayed for below.


### AS A FOURTH CAUSE OF ACTION
### FOR DISCRIMINATION UNDER
### NEW YORK STATE LAW
### (Against All Defendants)

110.   Plaintiff repeats and re-alleges each and every allegation made in the above paragraphs of this
       complaint as if fully set forth at length.

111.   Executive Law §296 provides that "1. It shall be an unlawful discriminatory practice: (a) For

an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

112. Defendant engaged in an unlawful discriminatory practice by discriminating against Plaintiff because of his race and color and creating a hostile work environment.

113. Plaintiff hereby makes a claim against Defendant under all of the applicable paragraphs of New York State Executive Law § 296.

**AS A FIFTH CAUSE OF ACTION**
**FOR AIDING AND ABETTING UNDER**
**NEW YORK STATE LAW**
**(Against All Defendants)**

114. Plaintiff repeats and re-alleges each and every allegation made in the above paragraphs of this complaint as if fully set forth at length.

115. New York State Executive Law §296(6) further provides that "It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so."

116. Defendant engaged in an unlawful discriminatory practice by aiding, abetting, compelling and/or coercing the discriminatory behavior as stated herein.

**AS A SIXTH CAUSE OF ACTION**
**FOR RETALIATION UNDER**
**NEW YORK STATE LAW**
**(Against All Defendants)**

117. Plaintiff repeats and re-alleges each and every allegation made in the above paragraphs of this

complaint as if fully set forth at length.

118.   New York State Executive Law §296(7) provides that it shall be an unlawful discriminatory

practice: "For any person engaged in any activity to which this section applies to retaliate or

discriminate against any person because [s]he has opposed any practices forbidden under this

article."

119.   Defendant engaged in an unlawful discriminatory practice by wrongfully retaliating against

the Plaintiff.


**AS A SEVENTH CAUSE OF ACTION**
**NEW YORK LABOR LAW § 740**
**(Not Against Individual Defendants)**


120.   Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs

of the Complaint as set forth at length herein.

121.   New York Labor Law § 740 provides that "An employer shall not take any retaliatory

personnel action against an employee because such employee does any of the following: (a)

discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or

practice of the employer that is in violation of law, rule or regulation which violation creates

and presents a substantial and specific danger to the public health or safety, or which constitutes

health care fraud; (b) provides information to, or testifies before, any public body conducting

an investigation, hearing or inquiry into any such violation of a law, rule or regulation by such

employer; or (c) objects to, or refuses to participate in any such activity, policy or practice in

violation of a law, rule or regulation."

122.   Defendant violated New York Labor Law § 740 when Defendant unlawfully retaliated against

Plaintiff for opposing unlawful practices that created and presented a substantial and specific

danger to public health and safety in violation of New York state and Federal food safety statutes and regulations.

**WHEREFORE**, Plaintiff demands judgment against all Defendants, jointly and severally, in an amount to be determined at the time of trial plus interest, punitive damages, attorneys' fees, costs, and disbursements of action; declaratory relief; and for such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a jury trial on all issues to be tried.

Dated:  New York, New York
        September 4, 2019

                                        DEREK SMITH LAW GROUP, PLLC
                                        *Attorneys for Claimant*


                                        _____
                                        Seamus P. Barrett, Esq.
                                        1 Penn Plaza, 49th Floor
                                        New York, NY 10119
                                        212.587.0760